UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| ADEOLA AKINDE, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 1:23-cv-00551-MSM-PAS |
| BRYANT UNIVERSITY, | ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge.

The plaintiff, Adeola Akinde, was employed by the defendant, Bryant University ("the University"), from January 2018 until his termination in December 2022. He brings claims alleging race and disability discrimination and retaliation under state and federal law. The University now moves for summary judgment, (ECF No. 28), which, for the reasons below, the Court GRANTS.

### I.    BACKGROUND

Mr. Akinde's claims against the University arise from his employment as a Public Safety Officer ("PSO") from January 2, 2018, until December 6, 2022. (ECF No. 29 ¶¶ 1, 79–83.) PSOs are part of the University's Department of Public Safety ("DPS") which is headed by the Executive Director of Public Safety, Chief Stephen Bannon. (ECF No. 29 ¶¶ 1–3.)

From the beginning of 2018 to 2020, Mr. Akinde began accumulating written performance issue write-ups and verbal admonishments for failing to show up to work

during assigned periods, for the use of his personal cell phone during work hours, and for failing to respond to dispatch calls.[1]  (ECF No. 29 ¶¶ 8–9, 76.)

On March 22, 2021, Mr. Akinde received a one-day suspension for losing his duty keys.  (ECF No. 29-1 at 281–82.)  The loss of duty keys "creates a crisis-level security risk" for the University because duty keys provide access to "nearly every building, office, residence hall, townhouse, and bedroom on campus."[2]  (ECF No. 29 ¶ 13.)  In response to this loss of duty keys, Chief Bannon instituted a new DPS protocol requiring every officer to attach their keys to a lanyard on their duty belt.  (ECF No. 29 ¶¶ 14–15.)

On December 13, 2021, Mr. Akinde submitted a completed Family and Medical Leave Act ("FMLA") certification form to the University indicating that he would need approximately six weeks of FMLA leave for lower back pain he was experiencing from a bad mattress.  (ECF Nos. 36-2 ¶ 115; 34-38.)  His chiropractor noted that his lower back pain prevented him from sitting or standing for prolonged periods.[3]  (ECF No.

---

[1] Mr. Akinde received a verbal warning for failing to respond to dispatch calls.  The parties agree that this incident falls outside the statute of limitations for the purposes of Title VII and FEPA.  (ECF No. 36-1 at 16 n.3.)  This incident also falls outside the three-year statute of limitations for RICRA.  R.I. Gen. Laws § 42-112-2.  Even so, Mr. Akinde refers to this incident as background evidence of the alleged pattern and practice of discriminatory treatment for timely claims.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

[2] The duty keys were found months later in a fraternity townhouse.  (ECF No. 29-1 at 208.)

[3] During his leave, Mr. Akinde flew to Nigeria, where he did not receive treatment, returning to the United States on January 14 and receiving a note of clearance on January 18.  (ECF No. 29-1 at 80–87, 292–96.)

36-2 ¶ 116.)  The University granted the leave, and Mr. Akinde was cleared for work upon his return in January 2022.  (ECF No. 29 ¶¶ 23–27.)

On June 15, 2022, Mr. Akinde received a second one-day suspension, this time for abandoning his shift to recline in the driver's seat of his car to take a nap for approximately two hours.[4]  (ECF No. 29-1 at 22–23, 94, 298–99.)  After reviewing security camera footage and interviewing Mr. Akinde, the University suspended him for one day.  Two weeks after Mr. Akinde's suspension for falling asleep in his vehicle, he submitted to the University, on June 29, 2022, a doctor's note stating he had allergy symptoms and that he "should remain out of work this week, could return 7/5/22."  (ECF No. 34-33.)

Mr. Akinde received an annual evaluation from Sgt. Haley on or around June 10, 2022, reviewing his performance since the beginning of the fiscal year, June 30, 2021.  After that evaluation was completed by Sgt. Haley, the University amended it to include the June 15, 2022, napping incident before it was signed by Chief Bannon on July 6, 2022.  (ECF Nos. 36-1 at 27; 34-10.)  Mr. Akinde maintained an overall rating of "effective" but received lower ratings in several individual categories.

On June 30, 2022, Mr. Akinde filed the first of his complaints against the University through a Union grievance regarding the procedures and the extent of the corrective action issued in response to the sleeping incident.  (ECF No. 29-1 at 301,

---

[4] The Union filed a grievance on Mr. Akinde's behalf alleging that his suspension violated the collective bargaining agreement and DPS policies.  (ECF No. 29-1 at 301–05.)  The University denied the grievance and the Union declined to take the grievance to arbitration.

304–05.)  On August 12, 2022, while Mr. Akinde's grievance was pending, he submitted a second complaint, this time to the Human Resources Department.  (ECF No. 29-1 at 143.)  There, Mr. Akinde claimed, as he does in this case, that Lt. Hayden treated him differently than other PSOs in terms of the tone of his communications, the distribution of assignments, and his willingness to criticize and issue corrective action.  (ECF No. 36-2 ¶¶ 89–94.)

Mr. Akinde again lost his duty keys on August 29, 2022.  (ECF No. 29-1 at 29, 341.)  Upon realizing he did not know where his keys were, he did not inform his superiors immediately as he had been instructed and failed to do so for approximately two hours.  (ECF No. 29-1 at 33–39.)  The University investigated the loss and subsequently suspended Mr. Akinde for one week, issuing him a final warning.  (ECF No. 29-1 at 341–42.) The day after the loss occurred and after Chief Bannon had placed him on interim suspension with pay, Mr. Akinde filed a complaint with the Rhode Island Commission for Human Rights ("RICHR") and the National Association for the Advancement of Colored People ("NAACP").  (ECF No. 36-2 ¶ 63.)  The Union did not file a grievance.  There is no record of any subsequent legal actions taken by the NAACP or the RICHR in response to this complaint.

On November 22, 2022, when Mr. Akinde was dispatched to conduct a wellness check in a student's dorm room, he failed to notice the student "laying on the floor of the room, unresponsive, approximately four feet from the door." (ECF Nos. 29 ¶¶ 63–70; 36-2 ¶¶ 170–72.) The student was later determined to have been deceased.  (ECF No. 29 ¶ 69.)   The University placed Mr. Akinde on paid suspension pending

investigation. (ECF No. 29-1 at 49.) Finding gross dereliction duty while on final warning status, the University terminated Mr. Akinde's employment on December 6, 2022. (ECF No. 29-1 at 386, 400.)

After he received a telephone call and voicemail from Chief Bannon on December 6, 2022, at 11:30 a.m. seeking to notify him of his termination, the University's Human Resources Department received a fax at 12:25 p.m. from a doctor of Mr. Akinde's stating: "[i]n order to avoid aggravation of [his] condition, I am excusing [him] from work until December 20th, 2022." (ECF No. 29-1 at 398.)[5] The note failed to specify the particular ailment afflicting Mr. Akinde. Chief Bannon called a second time at 1:09 p.m. This time Mr. Akinde picked up and Chief Bannon informed him that the University had terminated his employment. (ECF No. 29 ¶ 83.) The termination was also communicated by email and formal letter.

Mr. Akinde filed a Charge of Discrimination with the RICHR and the Equal Employment Opportunity Commission ("EEOC") on May 4, 2023. (ECF No. 11 ¶ 45.) He obtained Right to Sue letters from the RICHR and EEOC on October 3, 2023, and November 2, 2023, respectively. (ECF No. 11 ¶ 47.) Mr. Akinde timely filed the instant suit.

In his complaint Mr. Akinde alleges violations of (1) Title VII of the Civil Rights Act of 1964 ("Title VII") for discrimination and retaliation on the basis of race; (2) the Americans with Disabilities Act of 1990 ("ADA") for discrimination and retaliation

---

[5] Mr. Akinde recognized Chief Bannon's phone call, listened to his voicemail, and sent text messages to another PSO about the possibility that he would be terminated. (ECF No. 29-1 at 186–89.)

for taking medical leave in December 2021 and attempting to on the day of his termination in December 2022; (3) the Rhode Island Fair Employment Practices Act ("FEPA") for discrimination on account of race and disability; (4) the Rhode Island Civil Rights Act ("RICRA") for discrimination on account of race and disability; (5) the Family and Medical Leave Act ("FMLA") for alleged retaliation for attempting to take FMLA leave on the day of his termination in December 2022; and (6) the Rhode Island Whistleblowers' Protection Act ("RIWPA") for retaliation for Mr. Akinde's reporting of the alleged racial discrimination. (ECF No. 11 at 11–13.)

The University now moves for summary judgment. (ECF No. 28.)

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party," and a fact is material "if it carries with it the potential to affect the outcome of the suit under the applicable law." *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir. 2000). "[A] party opposing a properly supported motion for summary judgment "'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting *National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253 (1968)) (cleaned up). "The

6

evidence of the non-movant"— here Mr. Akinde — "is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Id.* at 255.

## III.    DISCUSSION

Mr. Akinde alleges discrimination on the basis of his race and disabilities, as well as unlawful retaliation against him for engaging in protected activities.  The adverse actions that Mr. Akinde alleges include suspensions for sleeping on duty (June 15, 2022) and for losses of his duty keys (March 2021 and September 2022), adjustment of his performance evaluation in June 2022, and his termination on December 6, 2022.

Mr. Akinde concedes that several of these claims are time-barred, but he still offers them as background evidence.  The parties agree that claims related to his sleeping on duty, his second loss of his duty keys, the amendment of his annual performance review, and his termination are not time-barred.

### A.    Discrimination and Retaliation Claims Subject to *McDonnell Douglas*

Mr. Akinde's discrimination and retaliation claims (Claims I–V) are subject to the burden shifting framework set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  It is "routine practice" for courts to analyze claims under Title VII, RICRA, and FEPA together.  *Ferro v. R.I. Dept. of Transp. ex rel. Lewis*, 2 F. Supp. 3d 150, 157 (D.R.I. 2014).  "Because both the federal and state claims protect against disability discrimination, the Court will treat them collectively."  *Barnes v. Amalgamated Transit Union, Div. 618*, 624 F. Supp. 3d 93, 97 (D.R.I. 2022).

Under the *McDonnell Douglas* framework, a plaintiff "must carry the initial burden under the statute of establishing a prima facie case" of discrimination. 411 U.S. at 802. To present a prima facie case the plaintiff must present evidence that he or she is : (1) a member of a protected class; (2) qualified for their job; (3) suffered an adverse employment action at the hands of their employer; and (4) there must be some evidence of a causal connection between their membership in a protected class and the adverse employment action. *Bhatti v. Trs. of Boston Univ.*, 659 F.3d 64, 70 (1st Cir. 2011).

If the plaintiff meets his or her burden, the defendant must then come forward with a "legitimate, nondiscriminatory reason" for the adverse action. *Id.* This task is not "onerous," and a defendant need only articulate a reason "which, on its face, would justify a conclusion" that the adverse employment action was taken for a nondiscriminatory motive. *O'Horo v. Bos. Med. Ctr. Corp.*, 131 F.4th 1, 14 (1st Cir. 2025) (quoting *Taite v. Bridgewater State Univ., Bd. of Trs.*, 999 F.3d 86, 93 (1st Cir. 2021)).

If the defendant provides a legitimate reason for the action, the burden shifts back to the plaintiff to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Velez v. Thermo King de Puerto Rico, Inc.*, 585 F.3d 441, 447–48 (1st Cir. 2009) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).

In evaluating a plaintiff's claims of discrimination, a court "must determine if

'there is a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination.'" *Ahmed v. Johnson*, 752 F.3d 490, 497–98 (1st Cir. 2014) (quoting *Holland v. Gee*, 677 F.3d 1047, 1056 (11th Cir. 2012) (internal quotation marks omitted)). To do so, this Court will not view each of Mr. Akinde's alleged instances of discrimination in "splendid isolation" but will examine each instance to see if the pieces form some semblance of a mosaic that could be recognized by a jury. *See Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 824 (1st Cir. 1991).

### 1.    Race-Related Discrimination Claims

Mr. Akinde alleges that multiple disciplinary actions taken during his employment, including suspension for sleeping on duty, suspensions for loss of his keys, revisions to his annual performance evaluation, and his ultimate termination were motivated by race discrimination. These claims are analyzed collectively because they rest on the same evidentiary theory: that the University disciplined Mr. Akinde more harshly than similarly situated non-minority employees. But even assuming Mr. Akinde can satisfy this initial burden to establish a prima facie case of race discrimination, the University has articulated legitimate, nondiscriminatory reasons for each challenged action, based on his documented performance deficiencies.

The undisputed record shows that Mr. Akinde was disciplined for specific instances of misconduct or neglect, including abandoning his post to sleep in his car, repeatedly losing duty keys that provided access to secure campus facilities, failing

9

to promptly report a key loss, and failing to conduct a wellness check in a manner that would have found a student unresponsive on the floor of a dorm room.

Mr. Akinde's attempt to show pretext relies primarily on comparator evidence. To be probative, such evidence must identify similarly situated employees outside the protected class who engaged in comparable misconduct and were treated more favorably. *See Lauriston v. Hallsmith-Sysco Food Servs., Inc.*, No. CIVA 08-CV-11956PBS, 2010 WL 2483327, at *5–7 (D. Mass. June 15, 2010). The record does not support such a finding. The University identified other employees who were suspended for sleeping on duty and whose discipline varied based on the circumstances and their disciplinary histories. (ECF No. 29-1 at 309, 320–21.) The only identified comparator for the lost duty keys incidents involved materially different circumstances, including immediate reporting and recovery of the keys. (ECF Nos. 29-1 at 207; 36-2 ¶ 71.) Mr. Akinde's general and unspecified recollections of other loss-of-keys incidents lack sufficient detail to establish comparability. (ECF No. 29-1 at 98–100.)

Mr. Akinde also challenges revisions made to his annual performance evaluation following his June 2022 suspension. The undisputed evidence shows that the evaluation was not final at the time of the revision and that inclusion of the sleeping-on-duty incident reflected performance during the relevant review period. Regardless, Mr. Akinde identifies no tangible adverse consequence resulting from this revision. *See, e.g.*, *Bhatti*, 659 F.3d at 73; *Bronson v. Town of S. Kingstown*, 766 F. Supp. 3d 336, 349 (D.R.I. 2025).

10

Finally, Mr. Akinde also relies on workplace interactions and perceived slights as circumstantial evidence of discriminatory animus. (ECF No. 36-1 at 11 n.1.) But he does not bring a "standalone hostile work environment claim." *Id.* To the extent this evidence is offered to establish pretext, it is insufficient. Such evidence must be tied to the specific adverse employment actions at issue and to the motivations of the relevant decisionmakers, not to isolated or conclusory assertions untethered from the disciplinary decisions challenged here. *See Mesnick*, 950 F.2d at 826–28; *Ray v. Ropes & Gray LLP*, 799 F.3d 99, 116 (1st Cir. 2015).

Viewing the record as a whole, Mr. Akinde has failed to present evidence from which a reasonable jury could conclude that the University's stated reasons for its disciplinary action or termination were a pretext for race discrimination. Accordingly, the University is entitled to summary judgment on the race discrimination claims.

### 2.   Retaliation and RIWPA Claims

Mr. Akinde also claims he was retaliated against for engaging in protected activity, including submitting complaints about his treatment after receiving notices of corrective action and calling the RICHR and NAACP to report race discrimination and submitting internal grievances and complaints. He contends that this protected activity prompted disciplinary actions in 2022 and ultimately led to his termination.

Retaliation claims are also analyzed under the *McDonnell Douglas* framework. To successfully overcome a motion for summary judgement, the plaintiff must establish a prima facie case that: (1) the plaintiff engaged in protected conduct, (2)

11

the employer took an adverse employment action, which was (3) in response to the employee's protected activity. *See Medina-Rivera v. MVM, Inc.*, 713 F.3d 132, 139 (1st Cir. 2013); *Kinzer v. Whole Foods Mkt., Inc.*, 99 F.4th 105, 115 (1st Cir. 2024). A reasonable jury must be able to conclude that retaliatory animus was the but-for cause of the adverse action. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). Thus, a plaintiff must show that their employer would not have taken the adverse action but for a desire to retaliate. *Id.* at 352, 360.

Mr. Akinde's claims that he suffered retaliation (1) after submitting a grievance in relation to his napping incident on June 15, 2022; (2) while his grievance was pending, submitting a complaint against Lt. Hayden on August 25, 2022; and (3) after submitting a complaint to the NAACP and the RICHR. The related adverse employment actions he alleges include his suspensions following the napping incident on June 15, 2022, and the loss-of-keys incident on August 29, 2022, and his termination on December 6, 2022. (ECF No. 36-1 at 37.) Mr. Akinde argues that the "temporal proximity between protected conduct and adverse actions establishes the causal link" necessary. *Id.* Temporal proximity, however, is not sufficient on its own to establish retaliation where the record reflects legitimate, nonretaliatory reasons for the employer's actions. *Wright v. CompUSA, Inc.*, 352 F.3d 472, 478 (1st Cir. 2003) (citing *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 16 (1st Cir. 1997)) (holding that "chronological proximity does not by itself establish causality, particularly if '[t]he larger picture undercuts any claim of causation'"). The undisputed record shows that the challenged disciplinary actions corresponded

directly to specific and acknowledged instances of misconduct or neglect, including sleeping on duty, losing duty keys, and failing to promptly report a key loss, all of which occurred contemporaneously with or independently of Mr. Akinde's protected activity.

The record also does not support an inference of a causal relationship between Mr. Akinde's protected activity and his termination. He was on final warning status at the time of his failure to observe an unresponsive student on the floor of a dorm room during a wellness check. The termination decision followed an investigation into that incident and was consistent with prior warnings Mr. Akinde had received about his performance. He presents no evidence that his protected activity factored into the decision-making process, nor does he identify statements or conduct by decisionmakers suggesting any retaliatory motive.

Mr. Akinde also alleges retaliation based on his contacts with the RICHR and the NAACP. The record does not establish that the University was aware of these contacts at the time it imposed discipline or decided to terminate Mr. Akinde's employment. Even assuming the University knew of his contacts, "knowledge on an employer's part, without more, cannot itself be sufficient to take a retaliation case to the jury." *Mesnick*, 950 F.2d at 828.

Viewing the record as a whole, no reasonable jury could conclude that Mr. Akinde's protected activities were the but-for cause of the disciplinary actions or his termination. For the same reasons, his retaliation claim under the Rhode Island Whistleblowers' Protection Act fails. *See Malone v. Lockheed Martin Corp.*, No. C.A.

07-065ML, 2009 WL 2151706, at *13–15 (D.R.I. July 16, 2009), *aff'd*, 610 F.3d 16 (1st Cir. 2010).

### 3.    Disability Discrimination and Retaliation Claims

Mr. Akinde's claims of disability-related discrimination, retaliation, and failure to accommodate are based on (1) his approved FMLA leave for a lower-back condition in December 2021; (2) his post hoc reliance on allergy symptoms following his June 2022 suspension for sleeping on duty; and (3) his submission of a medical note on the day of his termination on December 6, 2022.[6] (ECF No. 11 ¶¶ 51–54.) He claims his June 2022 suspension and his December 6 termination constituted adverse action. (ECF No. 36-1 at 42–44.) The University assumes for the purposes of its argument that Mr. Akinde's lower back pain constitutes a disability but contends that Mr. Akinde's claims are either time-barred or otherwise fail to make out a prima facie case of discrimination. (ECF No. 28 at 37.)

A claim of disability discrimination requires a plaintiff to make a prima facie showing that (1) that they are disabled; (2) that they were able to perform the essential functions of their job with or without accommodation; and (3) that they were discharged or adversely affected, in whole or in part, because of their disability or related protected conduct. *Lopez-Lopez v. Robinson Sch.*, 958 F.3d 96, 104 (1st Cir. 2020) (quoting *Ruiz Rivera v. Pfizer Pharms.*, LLC, 521 F.3d 76, 82 (1st Cir. 2008)); *DeCamp v. Dollar Tree Stores, Inc.*, 875 A.2d 13, 25 (R.I. 2005). To establish

---

[6] Plaintiff's Count IV alleges only discrimination in violation of RICRA, not retaliation. (ECF No. 11 ¶ 53.)

retaliation, a plaintiff must demonstrate a causal connection between protected activity and adverse action. *See Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 161 (1st Cir. 1998); *Freadman v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 106 (1st Cir. 2007); *Shoucair v. Brown Univ.*, 917 A.2d 418, 427 (R.I. 2007).

The undisputed record shows that the University granted his request for FMLA leave for his back condition in December 2021 and permitted him to return to work in January 2022 with no restrictions. Mr. Akinde identifies no adverse employment action taken at or near the time of his leave, nor does he present evidence linking his June 2022 discipline for sleeping on the job to that earlier, fully accommodated medical leave. Temporal distance of approximately six months between protected leave and discipline is insufficient, standing alone, to establish causation, particularly where the record reflects intervening and independent performance deficiencies. *Stratton v. Bentley Univ.*, 113 F.4th 25, 49–50 (1st Cir. 2024) (explaining that alleged adverse action taken three and a half months after FMLA leave was insufficient to establish causation where employee had a long record of performance issues).

Mr. Akinde's reliance on allergy symptoms, as the cause of his sleeping on the job, following his June 2022 suspension likewise does not establish discrimination or retaliation. The record demonstrates that he was disciplined for abandoning his post and sleeping in his car. His later suggestion that allergy medication explained this conduct was not supported by contemporaneous medical documentation and was not communicated to the University as a request for accommodation before the

disciplinary action. (ECF No. 36-1 at 44, 49.) An employer cannot be liable for failing to accommodate or for discriminating based on a disability that was neither known nor medically substantiated at the time of the adverse action. *See Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 90 (1st Cir. 2012).

Finally, Mr. Akinde contends that his termination was discriminatory or retaliatory because he submitted a medical note excusing him from work shortly after receiving a voicemail from his supervisor notifying him of his termination. The undisputed timeline shows otherwise. (ECF Nos. 29 ¶¶ 79–86; 36-2 ¶¶ 118–19.) The record demonstrates that the decision to terminate Mr. Akinde's employment was made earlier on the morning of December 6, 2022, before the medical note was faxed to Human Resources. His termination cannot have been the result of a disability or a request for leave that occurred after the decision was made. *See O'Rourke v. Tiffany & Co.*, 988 F.3d 23, 25 (1st Cir. 2021) (finding lack of knowledge of FMLA protected activity barred retaliation claim).

Mr. Akinde has failed to establish a prima facie case of disability discrimination, retaliation, or failure to accommodate under the ADA, FEPA, RICRA, or the FMLA. Even assuming such a showing, the University has articulated legitimate reasons for its actions, and Mr. Akinde has not presented evidence from which a factfinder could conclude that the University's reason was pretextual.

## IV.    CONCLUSION

Viewing the record as a whole, Mr. Akinde has failed to establish a genuine dispute of material fact as to any claim.    The Court therefore GRANTS the University's Motion for Summary Judgment in its entirety.  (ECF No. 28.)

IT IS SO ORDERED.

_____
Mary S. McElroy,
United States District Judge

April 22, 2026